**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**MICHAEL C. ROSS,**

**Petitioner,**

**v.**

**DON LANGFORD,**

**Respondent.**

**Case No. 24-3031-DDC**

**MEMORANDUM AND ORDER**

A child died while in the care of Michael C. Ross. The state charged him with first-degree, premeditated murder and, in the alternative, felony murder based on the felony of child abuse. A jury convicted Ross of second-degree murder (a lesser-included offense of premeditated first-degree murder), felony murder, and abuse of a child. A judge then sentenced Ross to life in prison for felony murder, with a consecutive sentence of 55 months for abuse of a child.

Ross, proceeding pro se,[1] has petitioned this court for a writ of habeas corpus. After screening, five arguments for habeas relief remain. The court denies Ross's petition. It explains this conclusion below, starting with the factual background.

[1] Ross proceeds pro se. Those "who proceed pro se . . . are entitled to liberal construction of their filings[.]" *Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

## I. Background[2]

One morning in November 2015, A.S. left her children—17-month-old G.H. and 4-year-old S.T.—in Ross's care while she went to work. When A.S. left, G.H. had a bruise on her right cheek but no other injuries and was acting normally. Ross was the only adult at home. Shortly after starting work, A.S. got a call from Ross. Ross told her G.H. had fallen and wasn't responsive. A.S. rushed home.

When A.S. arrived back home, G.H. was lying on a bed breathing but nonresponsive. G.H. had new bruises on her face and a bump on her head. While A.S. called 911, G.H. started having seizures. Paramedics arrived and found G.H. nonresponsive. The paramedics observed that G.H. had a bad bruise on her forehead, a swollen upper lip, bite marks, and other healing bruises on her body. The paramedics moved G.H. to the ambulance and, as they rode to the hospital, rated her at the lowest possible alertness score on the Glasgow Coma Scale.

Dr. Eric Glendinning treated G.H. when she arrived at the hospital. Glendinning noticed the bruising on G.H.'s face, her swollen lip, and bruising on her abdomen. A CT scan revealed bleeding near G.H.'s brain and a liver laceration. These symptoms suggested child abuse, so Glendinning consulted with Dr. Elizabeth Heflin, a pediatric intensivist. Heflin observed a subdural hemorrhage (blood collecting on the brain's surface from a brain bleed), bilateral retinal hemorrhages (bleeding in both eyes), bruises across G.H.'s body indicating multiple impacts, and a bite mark. Later testing showed G.H. had such high intracranial pressure that her brain couldn't receive adequate blood flow.

---

[2] The court draws these facts from the Kansas Supreme Court's decision affirming Ross's conviction and sentence, *State v. Ross*, 445 P.3d 726, 728 (Kan. 2019). *See* 28 U.S.C. § 2254(e)(1) (establishing presumption that state-court factual findings are correct unless a petitioner rebuts those facts by clear and convincing evidence).

G.H. was declared brain dead a few days later. A forensic pathologist performed an autopsy and determined that G.H.'s manner of death was homicide.

Prosecutors charged Ross with (1) premeditated first-degree murder, (2) felony murder as an alternative to premeditated first-degree murder, and (3) child abuse. Before trial, Ross told different stories about G.H.'s injuries:

- Ross told paramedics G.H. fell—possibly into a doorway;
- Ross told a police detective that he hadn't seen the accident but A.S.'s other child, S.T., told him G.T. had fallen;
- Ross wrote A.S. letters from jail that described G.H. falling while standing on a toilet, G.H. slipping in water on the bathroom floor, S.T. pushing G.H. off a counter and causing G.H. to hit her head on a chair, and a falling television hitting G.H.;
- Ross told his mother different accounts; and
- Ross's former cellmate, Demarco Rippatoe, claimed Ross told him four different stories, including one in which Ross admitted to slamming a 65-to-70-pound television onto G.H.

At trial, prosecutors focused on the severity of G.H.'s injuries and Ross's changing story. They played recorded jail calls between Ross and his mother, which featured different accounts of the incident. And plaintiff's former cellmate, Rippatoe, testified about the various stories Ross had shared with him about the incident.

Glendinning and Heflin, G.H.'s doctors, testified at trial. Glendinning estimated the injury that caused G.H.'s brain bleed occurred within a few hours of her arrival at the hospital. According to Glendinning, G.H.'s brain injury had an acute cause, rather than a gradual one. For G.H.'s liver injury, Glendinning testified that a significant force—like that of a car accident at highway speed—caused the injury. Glendinning opined that a falling 65-to-70-pound television could've caused the liver injury if it had landed on the abdomen.

Heflin testified that a subdural hemorrhage like the one G.H. had sustained usually occurs when the skull goes one way and the brain goes the other way. This opposition rips the veins apart. And a person who suffers a subdural hemorrhage isn't lucid between injury and symptoms. Retinal hemorrhages, according to Heflin, generally stem from violent shaking of the head. Heflin's testimony ruled out a few other possible causes of G.H.'s injuries. She testified that a child of S.T.'s size couldn't have caused the injuries. Nor could common toddler troubles—running into furniture or falling—have caused the injuries. Heflin thus opined that someone inflicted G.H.'s injuries—they weren't an accident.

Ross testified in his own defense. He testified that, shortly after A.S. left for work, G.H. fell off the kitchen counter and hit her head on an iron chair. G.H. seemed fine after the fall. Ross then went to sleep; he was exhausted after coming down from crystal meth and staying awake for two-and-a-half days. Ross woke up when he heard S.T. and G.H. playing in the sink. He found G.H. between the tub and the toilet and S.T. standing on the toilet. G.H. walked to him, but she fell again due to water on the floor. Ross left G.H. and S.T. to play and went back to sleep. S.T. later woke Ross and told him the television was on top of G.H. Ross testified that he found G.H. under the television, which covered her head and abdomen. And Ross claimed that G.H. was unconscious and having a seizure, yet rubbing her ribs on her left side. Ross asserted that he panicked and administered CPR to G.H.

In addition to instructions for the charged crimes, the trial court decided, on its own motion, to submit an intentional second-degree murder instruction as a lesser-included offense to first-degree murder. Ross's trial counsel urged the court to instruct the jury on unintentional but reckless second-degree murder as well. The court denied that request.

The jury convicted Ross of first-degree felony murder, second-degree murder, and felony abuse of a child. The district court sentenced Ross to (i) life imprisonment without the possibility of parole for 25 years based on the felony-murder conviction and (ii) 55 months' imprisonment for the abuse-of-a-child conviction, with the two sentences to run consecutively. The district court imposed no sentence on the second-degree murder conviction.

The Kansas Supreme Court affirmed on direct appeal. *State v. Ross (Ross I)*, 445 P.3d 726 (Kan. 2019). Ross filed a timely motion for postconviction relief in state district court. The state district court denied the motion. The Kansas Court of Appeals affirmed the decision denying postconviction relief. *Ross v. State (Ross II)*, 520 P.3d 793, 2022 WL 17544331, at *5 (Kan. Ct. App. 2022). Ross petitioned the Kansas Supreme Court, and the Court denied his petition for review. *See* Mandate at 1, *Ross v. Kansas*, No. 21-123907-A (Kan. Ct. App. Sep. 14, 2023). Ross then filed his 28 U.S.C. § 2254 petition seeking a writ of habeas corpus from this federal court. Doc. 1.

After screening, five grounds remain for the court to review. Doc. 32 at 7. The court recites the legal standard governing its analysis, next.

## II. Legal Standard

A federal court reviews a habeas petitioner's challenge to a state court's decisions under the Antiterrorism and Effective Death Penalty Act. *Lockett v. Trammell*, 711 F.3d 1218, 1230 (10th Cir. 2013). AEDPA "requires federal courts to give significant deference to state court decisions" on the merits. *Id.* When a state court has decided a claim on its merits, federal courts defer to that state-court decision unless it violates one of § 2254's two prongs: It "'[1] was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States,' or '[2] was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.'"

*Martinez v. Quick*, 134 F.4th 1046, 1055–56 (10th Cir. 2025) (brackets omitted) (quoting 28 U.S.C. § 2254(d)(1)–(2)).

The first prong, § 2254(d)(1), requires the court to "first determine the relevant clearly established law." *Id.* at 1056 (quotation cleaned up). The statute's operative phrase—"clearly established Federal law"—refers only to Supreme Court holdings, not dicta. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). A petitioner can use one of two avenues to satisfy his burden under § 2254(d)(1). The first avenue—contrary to clearly established law—applies "'if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (alteration in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). The second avenue in § 2254(d)(1)—an unreasonable application of clearly established law—applies when a state-court decision "'identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of petitioner's case.'" *Lockett*, 711 F.3d at 1231 (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). "An unreasonable application of law is more than an incorrect application of law; a petitioner must show that a state court's decision is so obviously wrong that no reasonable judge could arrive at the same conclusion given the facts of the petitioner's case." *Martinez*, 134 F.4th at 1056 (quotation cleaned up).

The second prong, § 2254(d)(2), "requires a petitioner to show that the state court's decision 'was based on an unreasonable determination of the facts.'" *Id.* (quoting § 2254(d)(2)). "Like § 2254(d)(1), this is a difficult standard to meet." *Id.* The court can't "classify a state court's factual finding as unreasonable merely because [it] would have reached a different conclusion in the first instance." *Id.* (quotation cleaned up). Even "if reasonable minds

reviewing the record might disagree about the finding in question," the court nonetheless "will defer to a state court's factual findings." *Id.* (quotation cleaned up).

## III. Analysis

As pertinent here, Ross challenges his state-court judgment on five grounds: (1) a Kansas statute unconstitutionally prevented a lesser-included-offense instruction for felony murder, (2) Ross's trial counsel was ineffective, (3) the trial court gave an erroneous jury instruction on the requisite intent for premeditated first-degree and second-degree murder, (4) the instructions should've told the jury that it couldn't convict him of both first-degree, premeditated murder, and felony murder, and (5) Ross's appellate counsel was ineffective on his direct appeal. The court considers each ground, in turn, below.

### A. Lesser Included Offenses of Felony Murder

Ross sought to argue to the jury that he fell asleep while watching G.H. and thus was guilty of misdemeanor child endangerment. Had the jury believed this argument, Ross asserts, they would've convicted him of involuntary manslaughter—not felony murder. But Ross couldn't present this defense to the jury because of Kan. Stat. Ann. § 21-5109(b)(1). This statute provides that "there are no lesser degrees of" felony murder. § 21-5109(b)(1). So Ross wasn't entitled to a jury instruction on involuntary manslaughter. Ross argues that this statute is unconstitutional, depriving him of the "right to present a guilt based defense to the charge of felony murder." Doc. 29 at 6.

#### 1. Procedural Bar

The State responds that this claim faces a procedural bar: The state court resolved this argument on independent and adequate state-law grounds. Doc. 36 at 12–13. The procedural-default "doctrine has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v.*

*Haley*, 541 U.S. 386, 392 (2004). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). "State procedural bars are not immortal, however; they may expire because of later actions by state courts." *Id.* "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review[.]" *Id.*

Ross presented this argument to the Kansas Supreme Court in his direct appeal from his convictions. *Ross I*, 445 P.3d at 734. And the Kansas Supreme Court declined to consider this argument because Ross had failed to raise it in the district-court proceedings. *Id.* That's a problem because, as "a general rule, an issue not raised before a district court cannot be considered for the first time on appeal." *Id.* The Kansas Supreme Court thus found Ross's argument "insufficiently preserved for appellate review." *Id.*

Here, the state argues that *Ross I* applied a state-law "rule barring review of unpreserved claims" and thus, under the independent-and-adequate-state-law-grounds doctrine, this court can't review Ross's claim.[3] But that was *Ross I*. What about *Ross II*—the Kansas Court of Appeals' review of Ross's postconviction motion? In *Ross II*, the Kansas Court of Appeals addressed Ross's argument that Kansas, by statute, unconstitutionally had precluded lesser-included offenses for felony murder. 2022 WL 17544331, at *3. *Ross II* addressed that argument on the merits, citing a Kansas Supreme Court decision that held "no constitutional defect in statutorily eliminating lesser included offenses for a felony-murder charge." *Id.* (citing *State v. Love*, 387 P.3d 820, 833 (Kan. 2017)). Because *Ross II* reached the merits of this claim,

[3] To be clear, the State recognizes that this procedural bar isn't a jurisdictional one. Doc. 36 at 12. Instead, in "the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

the procedural bar has lifted, and this court thus reaches the merits of Ross's claim. *Ylst*, 501 U.S. at 801.

### 2. Merits

As mentioned above, Ross asserts that Kansas law violated his constitutional rights because its statute, Kan. Stat. Ann. § 21-5109, eliminates lesser degrees of felony murder and thus prevented him from presenting a guilt-based defense. Doc. 29 at 6. The court construes Ross's claim to challenge his convictions based on his constitutional right to present a defense.

"A criminal defendant's right to present a defense is essential to a fair trial." *United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005). "The Fifth and Sixth Amendments guarantee a defendant the 'right to present a defense.'" *United States v. Oldman*, 979 F.3d 1234, 1252 (10th Cir. 2020) (quoting *United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004)). The Fifth Amendment side of this right includes "the Fifth Amendment's guarantee of due process and privilege against self-incrimination."[4] *Markey*, 393 F.3d at 1135. The Sixth Amendment side of this right to present a defense "is rooted in the Sixth Amendment's confrontation and compulsory process clauses," and thus includes a "defendant's right to testify, present witnesses in his own defense, and to cross-examine witnesses against him[.]" *Id.*

Here, Ross's challenge has nothing to do with witnesses or cross-examination. So it doesn't implicate any Sixth Amendment protections. This means that Ross's claim of an unfair trial must invoke the due-process side of the right to present a defense. *See Strickland v. Washington*, 466 U.S. 668, 684–85 (1984) (differentiating between Fifth Amendment due-process protections and Sixth Amendment issues by assigning guarantee of a fair trial to due-process clause and assigning elements of that fair trial to Sixth Amendment).

---

[4] The Fifth Amendment's protections extend to the states through the Fourteenth Amendment. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

To reject this argument, the Kansas Court of Appeals relied on the Kansas Supreme Court's decision in *State v. Love*. 387 P.3d 820. *Ross II*, 2022 WL 175443310, at *3. And to understand *Love*, one must understand two decisions by the United States Supreme Court—*Beck v. Alabama*, 447 U.S. 625 (1980), and *Hopkins v. Reeves*, 524 U.S. 88 (1998).

In *Beck*, the Supreme Court held that an Alabama statute prohibiting trial courts from instructing a jury on a lesser-included offense in a capital case violated the Constitution. 447 U.S. at 627–29. The defendant there was charged with intentional killing during a robbery—a capital crime—and he wanted the jury to consider the lesser-included (and not-death-penalty-eligible) offense of felony murder. *Id.* at 629. But he couldn't because an Alabama statute barred a lesser-included offense instruction, leaving the jury with just two choices: (1) convict the defendant and impose the death penalty or (2) acquit the defendant, leaving him unpunished. *Id.* The Supreme Court took issue with Alabama's approach, noting that federal courts and nearly every state allowed for a lesser-included-offense instruction in this circumstance. *Id.* at 637. The Court thus concluded that a lesser-included-offense instruction was a valuable procedural safeguard; and failing "to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* The Court refused to tolerate such a risk "in a case in which the defendant's life is at stake." *Id.* And so, *Beck* found Alabama's statute unconstitutional. But the Court declined to decide whether due process "would require the giving of such instructions in a noncapital case." *Id.* at 638 n.14.

Eighteen years later, the Court encountered a similar issue in *Hopkins*. The outcome in *Hopkins* limited *Beck*'s reach and in a fashion that informs the analysis here. There, the state of Nebraska had charged the defendant with two counts of felony murder. 524 U.S. at 91. And

under Nebraska law, "a conviction for felony murder render[ed] a defendant eligible for the death penalty[.]" *Id.* at 92. Specifically, if the jury convicted a defendant of a death-eligible offense, Nebraska law provided that a three-judge panel would decide whether to impose the death penalty. *Id.* At trial, the defendant sought lesser-included offense instructions for second-degree murder and manslaughter. *Id.* But the trial court declined the requested instructions because "the Nebraska Supreme Court consistently has held that second-degree murder and manslaughter are not lesser included offenses of" felony murder. *Id.* A federal court of appeals held that this refusal to submit lesser-included-offense instructions violated *Beck*. *Id.* at 93.

The Supreme Court reversed. *Id.* at 94. The Court began by distinguishing the case from *Beck*. The Alabama law at issue in *Beck* prohibited lesser-included offense instructions in capital cases, even though Alabama law recognized lesser-included offenses and lesser-included-offense instructions were available in noncapital cases. *Id.* at 94–95. Alabama thus had "erected an 'artificial barrier' that restricted its juries and required them to choose between conviction for a capital offense and acquittal." *Id.* at 96. Not so in Nebraska, the Court reasoned. Nebraska's Supreme Court long had held "in both capital and noncapital cases, that second-degree murder and manslaughter are not lesser included offenses of felony murder." *Id.* at 95. So "the Nebraska trial court did not deny [defendant] instructions on any existing lesser included offense of felony murder; it merely declined to give instructions on crimes that are not lesser included offenses" under Nebraska law. *Id.* at 96. Saying it another way, Nebraska hadn't erected an artificial barrier that restricted juries, nor had it treated capital and noncapital cases differently. *Id.* What's more, the Nebraska laws didn't present the risks created by the Alabama scheme. The Alabama scheme imposed the death penalty automatically upon the jury's conviction whereas, in Nebraska, a three-judge panel would decide defendant's sentence. *Id.* at 98. And the

Alabama scheme limited the jury's choices to choosing between acquittal and death. In contrast, Nebraska law allowed the three-judge panel to choose between death and life imprisonment. *Id.*

The *Hopkins* Court framed the matter as one of state sovereignty: "Almost all States, including Nebraska, provide instructions only on those offenses that have been deemed to constitute lesser included offenses of the charged crime. We have never suggested that the Constitution requires anything more." *Id.* at 96–97 (quotation cleaned up). The Court declined to create an affirmative, constitutional obligation for trial courts to instruct "on any offense that bears a resemblance to the charged crime and is supported by the evidence." *Id.* at 97. The Court declined to do so because such "an affirmative obligation is unquestionably a greater limitation on a State's prerogative to structure its criminal law than is *Beck*'s rule that a State may not erect a capital-specific, artificial barrier to the provision of instructions on offenses that actually are lesser included offenses under state law." *Id.* at 97–98.

Against this backdrop, the Kansas Supreme Court decided *Love*. 387 P.3d 820. *Love* involved charges of felony murder and child abuse. *Id.* at 825. The *Love* defendant requested a lesser-included-offense instruction of second-degree intentional murder. *Id.* at 831. But Kan. Stat. Ann. § 21-5109(b)(1) prohibited any lesser degrees of felony murder. *Id.* The defendant, citing *Beck*, argued that § 21-5109(b)(1)'s "elimination of lesser included offenses of felony murder violates his due process rights[.]" *Id.*

The Kansas Supreme Court evaluated this federal constitutional claim by walking through the analyses in *Beck* and *Hopkins*. *Id.* at 831–33. And, it determined, § 21-5109(b)(1) didn't violate due process because the Kansas statute resembled *Hopkins* more than it resembled *Beck*. *Id.* at 833. That is, the Kansas statute doesn't create a capital-specific artificial barrier for the jury. *Id.* Indeed, in Kansas, felony murder isn't a capital offense. *Id.* The Kansas Supreme

Court also emphasized that, in "*Hopkins*, Nebraska common law established that the additional offenses upon which the defendant sought jury instructions were not lesser included offenses of felony murder." *Id.* And § 21-5109(b)(1) "accomplishes the same thing." *Id.* Putting it simply, *Hopkins* allowed a state's supreme court to do away with the lesser-included offenses of felony murder. So, in the Kansas Supreme Court's view, *Hopkins* allows the state's *legislature* to do the same thing. *Id.*

Here, when the Kansas Court of Appeals denied postconviction relief to Ross, it relied heavily on the Kansas Supreme Court's decision in *Love*. *See Ross II*, 2022 WL 17544331, at *3. Ross has done next to nothing to show that the Court of Appeals' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law[.]" § 2254(d)(1). Indeed, Ross never addresses the *Love* decision. *See* Doc. 29 at 6 (never mentioning *Love*); Doc, 38 at 1–2 (same). Instead, Ross's traverse merely asserts that the trial court must "instruct on all the relevant law as to lesser included offenses[.]" Doc. 38 at 2. But this conclusory assertion misses the point. With Kan. Stat. Ann. § 21-5109(b)(1), the Kansas legislature has decided that the state-law crime of felony murder has no lesser-included offenses. And the United States Supreme Court held in *Hopkins* that states could eliminate lesser-included offenses for felony murder without offending the Constitution. 524 U.S. at 95–96.

Perhaps Ross could have responded to *Hopkins* by arguing that Kansas's situation differs from Nebraska's law. And that's not wrong. Nebraska eliminated felony murder's lesser-included offenses by court decision. Kansas eliminated them by statute. But this distinction doesn't matter. *Hopkins* embraced a state-sovereignty rationale, emphasizing that it's "a State's prerogative to structure its criminal law[.]" *Id.* at 97. Given this rationale, the court can find no reason why it matters whether a state's courts or its legislature made the decision eliminating

lesser-included offenses for felony murder. In sum, in *Love*, the Kansas Supreme Court—and, by extension, the Kansas Court of Appeals in Ross's postconviction case—didn't contradict or unreasonably apply federal law when it held that § 21-5109(b)(1) doesn't abridge due process.

**B. Ineffective Assistance of Counsel**

Next, Ross argues that his conviction violated the Sixth Amendment because his trial counsel was ineffective. Doc. 29 at 11. The Kansas Court of Appeals rejected Ross's ineffective-assistance-of-counsel claim for a variety of reasons. The question is whether the Kansas Court of Appeals unreasonably applied clearly established federal law or relied on an unreasonable factual finding when rejecting this claim.

The relevant clearly established federal law is the well-established two-part test for ineffective assistance of counsel: (1) deficient performance and (2) resulting prejudice. *Strickland*, 466 U.S. at 687–88; *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023). It is "particularly difficult" to show that a state court violated § 2254(d)(1); that is, it's hard to show that a state court applied *Strickland* unreasonably or reached a decision contrary to *Strickland*. *Martinez*, 134 F.4th at 1057. "The question is not merely whether counsel performed reasonably under *Strickland*; instead, it is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (quotation cleaned up).

Liberally construed, Ross argues that his counsel was ineffective based on:

- a breakdown in communication, Doc. 29 at 11;
- lack of preparation, *id.*;
- failure to hire an independent medical expert, Doc. 38 at 3–4;
- failure to investigate the jailhouse informant, Rippatoe, *id.* at 3;
- inadequate impeachment of "non-witness declarants whose statements [were] offered in evidence," *id.*;

- failure to impeach witnesses as Ross requested, *id.*;
- the cumulative effect of these errors, *id.* at 4.

Take each in turn.[5]

**1. Communication Breakdown**

Ross first argues that he and his counsel had a breakdown in communication. Doc. 29 at 11. To determine whether a communication breakdown rendered counsel constitutionally ineffective, our Circuit prescribes four factors:

> (1) whether [petitioner] made a timely motion requesting new counsel; (2) whether the trial court adequately inquired into the matter; (3) whether the conflict between the [petitioner] and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense[;] [and] . . . (4) whether the [petitioner] substantially and unjustifiably contributed to the breakdown in communication.

*Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir. 2000) (quotation cleaned up). On February 23, 2017, Ross asked the trial court to fire his lawyer, Tricia Oldridge, for ineffective assistance of counsel and allow him to proceed pro se.[6] Doc. 37-3 at 156–58. The trial court granted Ross's request to represent himself. *Id.* at 184, 202–04. But one day later, Ross withdrew that request and requested Oldridge to resume her representation. *Id.* at 179. The trial court did as

5 The state court addressed some of these grounds but not others. The Kansas Court of Appeals addressed Ross's "general complaint" about his trial lawyers. *Ross II*, 2022 WL 17544331, at *4. The Kansas Court of Appeals also addressed Ross's more specific complaints about trial counsel's (i) failure to retain a medical expert and (ii) failure to investigate Rippatoe adequately. *Id.* at *4–5. So, of the seven grounds raised by the current motion, the Kansas Court of Appeals addressed two. But the state has waived any exhaustion issues with this ineffective-assistance-of-counsel claim. Doc. 36 at 3. And, given the pervasive theme of ineffective assistance throughout Ross's petition, the court addresses these claims on their merits.

6 Ross's petition cites this motion for new counsel as the operative motion for his communication-breakdown claim. Doc. 29 at 11. The court thus doesn't consider any other motions Ross made—if any—for new counsel.

Ross asked, *i.e.*, rescinded its order, and Oldridge thus represented Ross at trial. *Id.*; *see also id.* at 211.

As a result, Ross fails the *Romero* factors. Ross might have made a timely motion for new counsel, but he later changed his mind and withdrew it. And he can't fault the trial court for its inquiry into the conflict—the trial court *granted* his motion. Nor has Ross shown that any breakdown prevented an adequate defense. Ross thus has failed to "put forth evidence of a severe and pervasive conflict with his attorney[.]" *United States v. Porter*, 405 F.3d 1136, 1140 (10th Cir. 2005). So the court rejects Ross's claim of ineffective assistance of counsel based on a communication breakdown.

**2. Preparation**

Ross next asserts that Oldridge failed to prepare adequately. Doc. 29 at 11. But "counsel is strongly presumed to have rendered adequate assistance[.]" *Strickland*, 466 U.S. at 690. And Ross provides no details to overcome this presumption. Therefore, the court rejects this part of Ross's claim.

**3. Medical Expert**

Ross also faults his trial counsel for failing to retain an independent medical expert. Doc. 38 at 3–4. The Kansas Court of Appeals rejected this claim because Ross "offered no evidence supporting his claim [that an expert] would have made any difference." *Ross II*, 2022 WL 17544331, at *4. Ross failed to proffer any evidence "from a medical expert who would have provided exculpatory evidence at trial." *Id.* The Kansas Court of Appeals found that Ross's "bare assertion that some hypothetical expert might have been called as a defense witness" failed. *Id.*

So too here; Ross hasn't shown that the Kansas Court of Appeals unreasonably evaluated the prejudice prong. § 2254(d)(2). Ross hasn't shown that a medical expert could've reached a

different conclusion about the cause of G.H.'s injuries or death. *See Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008) (rejecting ineffective-assistance-of-counsel claim based on failure to call medical expert where petitioner "failed to show . . . that medical experts could have reached a conclusion regarding consent contrary to the conclusions reached by the [prosecution's] nurses"). Instead, Ross claims that he merely wanted his counsel "to get a second opinion." Doc. 38 at 3.

But it's not clear what a second opinion would have added. Ross's attorneys cross-examined Glendinning and Heflin. Doc. 37-14 at 30–44 (Glendinning); Doc. 37-16 at 124–53 (Heflin). Their cross-examinations demonstrate that counsel understood the nature of the evidence against Ross. For G.H.'s liver injury, Ross's counsel elicited testimony that a torn liver requires equipment to diagnose—Glendinning couldn't see a liver injury just by looking at G.H. Doc. 37-14 at 33–34. And for G.H.'s brain injury, Glendinning testified that sometimes blood accumulates quickly, but sometimes the blood takes time to accumulate. *Id.* at 36. Heflin agreed with defense counsel that a heavy falling object, like a television, could've caused the liver laceration or possibly hit G.H. in the head and abdomen. Doc. 37-16 at 142–44. Heflin also agreed with defense counsel that multiple falls could aggravate an initial injury. *Id.* at 140.

And, later in the trial, defense counsel used that testimony. In closing, defense counsel suggested that the older child, S.H., crawled up and knocked the television onto G.H. The defense's closing also highlighted Heflin's admission that multiple incidents can aggravate injuries and argued that Ross's story of three injuries—G.H. falling off the kitchen counter, falling in the bathroom, then having a television fall on her—was plausible. Doc. 37-17 at 191–92. The state court's conclusion—that counsel's strategy didn't prejudice Ross—was thus a

reasonable one. *See Boyle*, 544 F.3d at 1139 (highlighting cross-examination by defense counsel to show lack of prejudice).

In sum, Ross has given the court no reason to think that an additional medical expert would've changed the outcome of his trial.

**4. The Jailhouse Informant**

Ross asserts that his counsel was ineffective for failing to investigate the jailhouse informant, Rippatoe, before trial. Doc. 38 at 3. Recall that Rippatoe testified that Ross told him four different stories about G.H.'s death. *See* Doc. 37-15 at 114. When addressing this claim, the Kansas Court of Appeals pointed out that Ross's counsel "extensively cross-examined" Rippatoe. *Ross II*, 2022 WL 17544331, at *5. It was "not obvious how further impeachment of the jailhouse informant would have advanced the trial defense." *Id.* And Ross himself had given multiple accounts of the event to law enforcement. *Id.* Ross also failed to identify "what specific information the trial lawyers might have used to further attack the" witness's credibility. *Id.*

Ross hasn't demonstrated anything unreasonable about the state court's analysis. And he hasn't suggested any fruit that additional investigation into Rippatoe might have yielded. At trial, defense counsel extensively cross-examined Rippatoe about (i) his criminal history, Doc. 37-15 at 153–58, (ii) his hope for leniency in exchange for his testimony, *id.* at 161–63, and (iii) his dubious claim that he never went through Ross's personal belongings, *id.* at 166. The court thus finds nothing unreasonable about the Kansas Court of Appeals' resolution of this claim.

**5. Impeachment**

Ross next challenges trial counsel "not filing a motion for impeachable matters" for non-witness declarants and "failure to pursue impeachment of witnesses" despite Ross's repeated requests. Doc. 38 at 3. But he doesn't provide any factual basis for this claim. He hasn't

provided the names of any witnesses or what counsel should've used to impeach those witnesses. *See United States v. Sands*, 968 F.2d 1058, 1066 (10th Cir. 1992) (finding no "colorable claim of ineffective assistance of counsel" where defendant failed to provide names or probable testimony of witnesses). And so Ross has failed to demonstrate constitutional error by his trial counsel. He's also failed to demonstrate that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

#### 6. Cumulative Effect

Having found no ineffective assistance of counsel in Ross's individual arguments, the court can't find ineffective assistance of counsel on a cumulative-error theory. *United States v. Kaufman*, 485 F. App'x 313, 318 (10th Cir. 2012) ("[B]ecause we reject all of [defendant's] individual claims of ineffective assistance of counsel, we cannot hold that the cumulative effect of his counsel's conduct was nonetheless ineffective.").

### C. General Intent Instruction

Ross claims that he was denied a fair trial because the jury instructions on first-degree and second-degree murder included a "general intent definition." Doc. 29 at 12. Ross calls this "clearly wrong" because "premeditated and second degree murder are both specific intent crimes." *Id.* The state argues that Ross has failed to exhaust this claim. Doc. 36 at 16.

Ross didn't raise this claim in his direct appeal. *See Ross I*, 445 P.3d at 730–34. As a result, the Kansas Court of Appeals, in Ross's postconviction proceedings, treated this as an ineffective-assistance-of-counsel claim for failure to object to the general-intent instruction. *See Ross II*, 2022 WL 17544331, at *4. Now in federal court, Ross again complains about the general-intent instruction. Doc. 29 at 12. And he blames any failure to exhaust on ineffective assistance of counsel. *Id.* The state asserts that Ross has failed to exhaust this claim because he presented it as an ineffective-assistance-of-counsel claim to the state courts but, here, "his

constitutional claim has fundamentally changed[.]" Doc. 36 at 17. In so arguing, the state fails to mention that Ross excuses his failure to exhaust by blaming ineffective assistance of counsel. *Id.* Because Ross proceeds pro se, the court construes this as an ineffective-assistance-of-counsel claim and declines to consider it barred. So, the court continues with the merits of this claim.

The Kansas Court of Appeals rejected this claim on prejudice grounds. *Ross II*, 2022 WL 17544331, at *4. The trial court didn't sentence Ross for the second-degree murder charge. *Id.* So, "Ross can show no actual prejudice since he was not sentenced on that conviction and the conviction does not appear in the journal entry of judgment." *Id.*

As a threshold matter, the trial court's second-degree murder instruction follows the Kansas pattern instruction for intentional second-degree murder. *Compare* Doc. 37-3 at 196, *with* Instruction No. 54.150, Kansas Judicial Council, Kansas Criminal Pattern Instructions (4th ed. 2026). It's difficult to conclude that trial counsel was constitutionally ineffective for failing to object to a pattern instruction. But, even if that were so, Ross hasn't demonstrated that the Kansas Court of Appeals' determination that he suffered no prejudice from this instruction was unreasonable.

Recall that prosecutors charged Ross with first-degree, premeditated murder. *See, e.g.*, Doc. 37-3 at 194. As a result, the trial court instructed the jury on second-degree murder as a lesser-included offense of first-degree, premeditated murder. *Id.* at 195. And the jury ultimately went with the lesser-included offense and convicted Ross of second-degree murder. *Id.* at 207. But the jury also convicted Ross of first-degree felony murder and abuse of a child. *Id.* The trial judge sentenced Ross on the first-degree, felony-murder conviction—not the second-degree murder conviction. *Id.* at 237. And he did so because, under Kansas law, when a defendant is

charged "with alternative counts, the jury is free to enter a verdict on each count." *State v. Blanchette*, 134 P.3d 19, 32 (Kan. Ct. App. 2006). But "the defendant may be convicted of only one offense." *Id.*; *see also State v. Vargas*, 492 P.3d 412, 417–18 (Kan. 2021) (holding that alternatively charged counts merge into a single conviction). So, even if the court vacated Ross's conviction for second-degree murder, it wouldn't affect his sentence because no sentence was imposed for the second-degree murder conviction.

Ross resists this premise, arguing that "there is no way whatsoever that the second degree murder is merged into felony murder" because the two offenses have "two different" intent requirements. Doc. 38 at 6. This federal court must defer to the Kansas Supreme Court's holding under state law that two alternatively charged counts merge into one. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").

The Kansas Court of Appeals thus didn't resolve this issue unreasonably.

### D. Alternative Theories of Guilt

Ross asserts that the trial court should've instructed the jury that the first-degree premeditated murder charge and the first-degree, felony-murder charge were alternative charges. Doc. 29 at 13. The Kansas Court of Appeals rejected this claim:

> That's not how juries are instructed, and a defendant cannot be punished for both. Although the jury found Ross guilty of both felony murder and intentional second-degree murder, the journal entry reflects only the conviction for felony murder, and Ross received a single sentence. So Ross incurred no legal prejudice. He further characterizes this as constitutionally deficient representation of his trial lawyers because they did not object to the verdict forms and instructions for that reason. The claim lacks merit here.

*Ross II*, 2022 WL 17544331, at *4.

In his federal habeas petition, Ross maintains that the prosecutor can charge various theories of murder, but the trial court should tell the jury that they can convict on just one theory.

Doc. 38 at 8. Yet he doesn't identify any clearly established federal law to support his argument, as § 2254(d)(1) requires. True, the Supreme Court has expressed a preference for trial courts to remove unsupported alternative theories. *Griffin v. United States*, 502 U.S. 46, 60 (1991). But it hasn't held that the Constitution *requires* trial courts to instruct the jury on a single theory. *Id.* ("The refusal [to remove an instruction on alternative theory] does not provide an independent basis for reversing an otherwise valid conviction."). The Kansas Court of Appeals thus didn't unreasonably apply federal law when it declined to find error in the district court's instructions.[7]

**E. Ineffective Assistance of Appellate Counsel**

Ross's final ground asserts that his direct-appeal counsel was ineffective because counsel failed to raise the other issues identified in his petition. Doc. 29 at 15–16. The Kansas Court of Appeals rejected Ross's claim, finding it a "collective restatement" of his previous arguments. *Ross II*, 2022 WL 17544331, at *5.

An ineffective-assistance-of-counsel claim aimed at appellate ineffectiveness requires a petitioner "to show that (1) appellate counsel performed deficiently in failing to raise the particular issue on appeal and (2) but for appellate counsel's deficient performance, there exists a reasonable probability the petitioner would have prevailed on appeal." *Martinez*, 134 F.4th at 1057. Ross's argument on this point functions as something of a catch-all, arguing that counsel for his direct appeal should've caught the errors identified in his habeas petition. Given the double deference this court must extend to state-court counsel and the Kansas Court of Appeals' evaluation of state-court counsel, Ross's catch-all argument wilts. None of the grounds addressed above have prevailed, so appellate counsel didn't act unreasonably by failing to raise

[7] Ross's traverse also attacks the jury instructions on state-law grounds, citing Kan. Stat. Ann. § 21-5109. Doc. 38 at 8. Issues of state law don't fall within the purview of federal habeas review. § 2254(d)(1).

them. Nor has Ross persuaded the court that the other grounds, dismissed on screening, could have prevailed on direct appeal.[8]

Even assuming the first element of ineffective assistance of appellate counsel, Ross has failed to show the second element—that there's a reasonable probability he would've prevailed on appeal. Indeed, on direct appeal, the Kansas Supreme Court found prosecutorial error in Ross's trial. *Ross I*, 445 P.3d at 731. But the Court found that error harmless in light of the evidence of Ross's guilt. *Id.* So, even if Ross's lawyer on his direct appeal identified any additional trial errors, it's unlikely that those errors would've warranted reversal.

The court thus concludes that this final ground for habeas relief fails.

---

[8] None of the grounds dismissed at the screening stage—grounds one, three, four, and eight—present a viable ground for appellate counsel to raise on direct appeal. *See generally* Doc. 30.

Ground one argues that because the jury rejected first-degree, premediated murder, that rejection operates as an acquittal of first-degree murder. Doc. 29 at 5. So, the first-degree felony murder conviction can't stand. But, as already explained, a state is allowed to pursue alternative theories. *See above* § III.D.

Ground three is an offshoot of Ross's argument about the lesser-included offenses of felony murder. It asserts Ross should've received an involuntary-manslaughter instruction. Doc. 29 at 8. The court already has explained why Ross wasn't entitled to receive an involuntary-manslaughter instruction. *See above* § III.A.

Ground four asserts that the trial court illegally struck a juror. Doc. 29 at 9. The state struck the only Black person in the jury pool and justified the strike by explaining that the Black prospective juror had a criminal record, and they'd also used a peremptory strike on a white person with a criminal record. *Ross II*, 2022 WL 17544331, at *4. Yet the white person's conviction was 17 years old. *Id.* So, in Ross's view, the state couldn't strike the white prospective juror. But the state can use its peremptory strikes on anyone for any reason, so long as the reason isn't race or sex. *See United States v. Brown*, 817 F.2d 674, 676 (10th Cir. 1987).

Ground eight asserts ineffective assistance of trial counsel. Direct appeal counsel needn't have raised this issue, either. In Kansas, "the merits of a claim of ineffective assistance of counsel ordinarily are not addressed for the first time on direct appeal." *Bogguess v. State*, 395 P.3d 447, 452 (Kan. 2017) (quotation cleaned up).

## IV. Conclusion

Finding none of Ross's arguments meritorious, the court denies his petition for a writ of habeas corpus. As a result, it must decide whether to issue a certificate of appealability.

Rule 11 of the Rules Governing Section 2254 Cases requires the court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Without such a certificate, a petitioner may not appeal the denial of his or her habeas petition. But if "the court denies a certificate, the [petitioner] may . . . seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rules Governing Section 2254 Cases, Rule 11(a).

Under 28 U.S.C. § 2253(c)(2)–(3), the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicate[s] which specific issue or issues satisfy [that] showing[.]" A petitioner can satisfy this standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" or that the issues presented in the petition are "'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983), *superseded in part by* 28 U.S.C. § 2253). And, when the court bases its ruling on procedural grounds, a petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* at 478.

Here, the court declines to issue a certificate of appealability. Nothing suggests that the court's rulings on any issue in this case are debatable or wrong, and no record authority suggests that the Tenth Circuit would resolve this case differently. The court thus declines to issue a certificate of appealability for any of Ross's claims. The court notes that Ross may not appeal its

denial of a certificate, but he may seek a certificate of appealability from the Tenth Circuit. *See* Rules Governing Section 2254 Cases, Rule 11(a).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Michael C. Ross's Second Amended Petition for Writ of Habeas Corpus (Doc. 29) is denied, and no certificate of appealability shall issue.

**IT IS SO ORDERED.**

**Dated this 12th day of November, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**